In addition to our regular calendar, we have one argued motion this morning. We will turn to that. And the matter is United States v. Ng. Thank you. Counsel? Good morning, Your Honors, and may it please the Court. Paul Clement for the Move-In. This case raises substantial questions concerning the scope of Section 666 and the FCPA, and the District Court's belief that flight risk increases when a defendant gets a relatively low sentence, gets matters backwards. Any sentence, I think, is what the District Court says. Once you're sentenced, you have a strong incentive not to show up. Right. And we think this Court has essentially corrected that same error in cases like Johnson and Levin. And those aren't published opinions, but it was the same kind of analysis by the District Court. And I think that's particularly misplaced in a case like this, because when you have somebody who's a foreign resident and has financial assets, I mean, they do have an incentive to flee. But in this case, those incentives were dealt with with very significant restrictions on the circumstances of his bail, such that he had two armed guards, such that he really had no ability to flee. The presumptions, though, changed before trial and after trial under the Bail Reform Act. So the presumption before trial was in favor of bail. The presumption after trial is against bail. So we're looking at it through a different prism. You're looking at it from a different prism. But I think this Court in prior cases has rejected the notion that just because you're looking at it through a different prism, that's a sufficient reason to deny bail. I think in the My point is that the burden of showing whether he was a risk of flight or is not a risk of flight in terms of the burden after a jerry-filing. Sure. Whatever the burden is, I think, and, you know, I think it is clear and convincing, but I think under that standard No, you have to show by clear and convincing evidence that he is not a risk of flight, not the government having to show that he is a risk of flight. Agreed, Your Honor. But I think, first of all, these conditions on his bail are so restrictive that there really is almost physically no way that he could flee. I mean, you're talking about a 69-year-old individual in relatively poor health who has two armed guards watching him at every stage, 24 hours a day. I think in addition to that It sounds like prison. It does, actually. And, you know, I think, you know, in a sense, I'm not sure that the chance of fleeing here is materially any different than it would be escaping from a federal prison. But on top of that, we do have the experience that these conditions or even less restrictive conditions for two-and-a-half years have been fully sufficient to prevent any kind of material flight risk. It would seem, though, that with respect to particularly wealthy individuals such as your client, that they would basically never have to be detained until actual sentence is pronounced because they can always afford these what we'll call private prisons. I don't think it means that, Your Honor. I mean, you know. Why not? Well, and let me be clear about that, which is to say it may be that, you know, if you have these kind of draconian conditions, that you probably aren't going to have a material flight risk. I mean, you know, you still have the other components of the test. So it's not going to be particularly in the post-conviction context that you're going to have an automatic right to bail pending appeal. And I hope to have a chance to talk about the substantial questions that are present in this case that I think are going to be absent in a lot of cases. The other thing just to emphasize is, you know, this may seem, if you look at it only from the ability to afford these restrictive conditions, there may seem like some unfairness in that. But you also have to keep in mind that part of the reason there's a flight risk is because he has the means to purchase tickets and things like that. So there's a way in which these kind of cancel out. And so I think that, you know, maybe the surface unfairness is more surface than unfair. But I do think in the main, you know, as I suggested, I think many people in the position of my client will not have substantial questions to raise on their appeal. Here, I think there are multiple substantial questions, starting with the question of whether Section 666 even applies to the U.N. if that's the kind of organization that the statute, you know, was meant to apply to. And we think there are both textual legislative history and canons of construction that strongly suggest that what Congress meant to reach was a private organization, not a public intergovernmental international organization. We've had other prosecutions of U.N. personnel. Bahail, you know that case, of course. I know that case, and I know that you know that case, Your Honor, and that Judge Raju knows that case. But I think there, this Court had a one statutory argument or maybe two statutory arguments why Section 666 didn't reach the U.N., but it did not have the argument that we're making here before you. And it's not a jurisdictional argument. I mean, so it's not the kind of thing the Court would have reached on its own motion. And I really do think that it's, you know, I take no issue with Bahail, but we do think that notwithstanding the idea that the U.N. Participation Act could provide benefits, that you still have the anterior question of whether the U.N. is the kind of organization that is reached by the statute at all. And we think there's a very good, certainly a substantial argument that it's not. We actually think, in an odd way, the F.C. Did you make that argument below to the District Court? Yes, we did. Yes, we did. And indeed, the District Court accepted the notion that at least Bahail was not controlling on that question. And I think that in an odd way, the F.C.P.A., which does reach the U.N., actually strengthens our argument because the F.C.P.A. is an example of the kind of language Congress would use if it actually intended to reach international public organizations. Because in that context, it uses the specific phrase public international organization, and then I think quite tellingly defines it by cross-reference to another act of Congress, the International Organization Immunities Act, which then sort of enumerates which organizations are in fact covered by that language. And that's a kind of careful approach to applying this kind of corruption statute to an international organization like the United Nations that I think Congress would have used if it actually intended that. Counsel, if we do not believe that you have overcome this strong presumption, are you interested in an expedited appeal? I think we would be under these circumstances, but I hope you don't reach that question. I hope that you instead recognize that there are substantial questions. I know you hope that, but an expedited appeal would also limit the defendant's time in prison, should you be successful. It would, but I think we have arguments that strongly suggest that no prison time is appropriate under these circumstances. And it's not just Section 666. Under the FCPA, the District Court refused to give an official acts instruction, which we think was error. We also think that the official acts instruction that the District Court gave under the Section 666 count was legally deficient, and I think it did not mirror the language that we proposed that would have mirrored McDonnell, essentially, in hack verba. And I think the best illustration of why the instruction that was given is deficient is that the government itself can still contend, I think with some justification, that some of the official acts that they identified to the jury, like a letter on U.N. stationary or an official meeting in Macau, were official acts under the instruction that the District Court gave. But we think that's plainly error. I mean, I think McDonnell makes clear that just because something is done by an official, just because it's done on letterhead, just because it's labeled an official visit, is not sufficient to make it an official act. Just because may be right, but not that it's absolutely impossible for it to be. It all depends on context, doesn't it? Isn't that what McDonnell instructs? Well, yes, but I think particularly what McDonnell instructs and there has to be an instruction that makes that clear to the jury. And we think this instruction was fatally defective in this regard, and we think the instruction leaves this Court in the same position that this Court was in the Skelos case and that the Supreme Court was in the McDonnell case. Given the way that this jury was instructed and given the arguments that the government made to the jury, I don't think that you can tell here whether or not the jury convicted based on the idea that the letterhead, the letter on letterhead was the official act or the visit to Macau was an official act, or whether some later act that might constitute an official act was what the jury relied on. I actually think the situation is even worse here. Because of the nature of this case, I think there would have been, should have been real pressure on the government to identify precisely what the official act was, because this is not something where, like in Baha'u'llah, where you have an effort to get a procurement contract that you should not get, and there's a clear official act at the end of that process, which is the award of the procurement contract. We're not deciding those questions, so I won't ask you some questions about that argument. I'd like to take you back, since you don't have much more time, to the flight concern. Government asserts in its papers that while your client was on bail pretrial, the security force that's supposed to be enforcing his bail allowed him to go out to dinner in violation of the bail conditions. Do you want to speak to that? Yes. Because it does go to how reliable the security services are. So I'd like to hear you on that. Sure. And I think it's, I'm glad to have the opportunity, because that happened very early in the conditions of release. That happened some 18 months ago. And it wasn't, you know, they were out to dinner at the Palm or something. I mean, they stopped at a takeout restaurant on the way back from an authorized visit to the apartment. It doesn't matter. It wasn't permitted. Right. And it was clarified that it wasn't permitted. It never happened again with 18 months of sort of subsequent experience. And I think, very importantly, the district court did not rely on that at all in its decision. I mean, my friends Precisely for that reason and the government's reference to it, I wanted to hear what your view on it was. Exactly. And, you know, I mean, there are other things, I mean, we could get, if we want to get into other incidents that the district court didn't rely on, there was actually an incident where one of the guards that was guarding my client had a heart attack. And rather than use that as an excuse to flee, my client tried to help and provide sort of, you know, try to get him CPR and that sort of thing. So we didn't get into that in our brief because we focused on what the district court relied on. And we think what the district court relied on was legally erroneous, just like in Johnson and Levin. Thank you, counsel. We'll hear from the government. May it please the Court. I'm Assistant United States Attorney Daniel Richenthal. I represented the government before the district court. I represent the government on appeal. I'm going to start where Judge Radji and Mr. Clement left off on flight. So not only was Judge Broderick well aware that the security firm here had let the defendant go to a restaurant, he was aware that the defendant had gone to a restaurant repeatedly. Now, Mr. Clement said that was clarified. That's not what happened. The district court's bail order was crystal clear. The defendant was permitted to go to court. He was permitted to go to his counsel's office and that's it. And he went to a restaurant repeatedly. No clarification was needed. In fact, pretrial services, this is all on the record, had expressly told the security firm what it should have already known, which is it also would not consent to the defendant going to a restaurant. They took him there anyway. These are not circumstances that presented a risk of flight. They are circumstances where people did not strictly abide by the conditions of release. So tell us why that should matter. Well, I think it matters for the same reason that multiple courts, including those cited in our brief, have recognized, which is that the incentives and practices of a private security firm are just not the same as the Federal Bureau of Prisons or the United States Marshals Service. The fact that they brought this man repeatedly to a restaurant, and although it was takeout, he stood there for some 20 minutes each time, is an indication of precisely that. These firms simply have different incentives. That doesn't make them bad. It makes them profit maximizers. And let me add, and this is also in the record, that far more recently than 18 months ago, in approximately August of September of 2017, the district court actually questioned multiple guards with that firm in the course of judging whether the defendant should remain on bail pending sentencing. It came out in that questioning, they also, in violation of the bail order, didn't also use a magnetometer on all visitors. They had simply decided, well, some people visited so frequently, they didn't need to be thoroughly searched. They were eating meals prepared by the defendant and his staff, which raises all kinds of concerns. And the district court expressed serious concern about that and substantially tightened the conditions, which is actually a point I wanted to make. This is not a case in which a district judge simply waved his or her hands and said, nope, no bail pending sentencing, I won't do a private firm. That actually might be permissible under this court's precedents, but that's not what Judge Broderick did. He presided over years of litigation, hearing after hearing, bail modification request after bail modification request, heard personally from multiple officers of the firm, presided over a five-week trial. And after all of that concluded, once sentencing came down, which was a substantially higher sentence than the defendant's counsel said the defendant himself anticipated, the calculus changed. And he made a case-specific, defendant-specific, fact-specific determination. Although it was below the recommended sentence, wasn't it? The sentence imposed on the defendant was lower than what the government had proposed. The government asked for? It was roughly 25 percent lower than what the probation officer of the government asked for, absolutely. Right. But my point is that contrary to other decisions, for example, Levin or Johnson, in this case, Judge Broderick was told vigorously and repeatedly by the defendant's counsel, Your Honor, he should stay on bail pending sentencing because he subjectively believes he will get a very low sentence or a non-incarceratory sentence at all. They said that orally. They said that in writing. They said it repeatedly. And the district court agreed to keep the defendant out. But then at sentencing, he got four years. Now, this is actually not a man with serious medical problems. That's not true. But it is a man who is roughly 70 years old. A four-year sentence is a substantial sentence. And Judge Broderick, having presided over all of this years of litigation, hearing from the security firm itself, well aware of the history of the firm, decided at this moment the defendant couldn't meet his burden. And it's a meaningful burden, clear and convincing evidence. That's a real burden. And the presumption is on the defendant to meet it. He didn't do it. Counsel argues in his reply brief that the clear and convincing only relates to the flight risk, not to the substantive matters before the appellate judge, the appellate panel that will hear the appeal. Is that correct? Yeah, we agree. It's clear and convincing. Clear and convincing only on flight risk. That's correct. Clear and convincing on flight risk. Substantial question, which then breaks further into also whether it would result in a new trial or a lower sentence as the other prong. Ultimately, whether the decision was clearly erroneous. Counsel, if we agree with you as opposed to defendant, could you participate in an expedited appeal? Absolutely, Your Honor. No problem for either of you to get this ready for our August sittings? Well, I haven't read Mr. Clement's brief yet, but no, no problem, Your Honor. I've talked about flight for some time. I want to make one more point. And then before my time closes, I do want to respond briefly to the substantial issues. Sure. So first on flight, Mr. Clement in his oral presentation and also in his moving papers suggested that Your Honor should not take account of what the security firm did in the past because Judge Broderick allegedly didn't. That's not a fair way to read what Judge Broderick said. Judge Broderick expressly referred to prior litigation in this case about bail. He said, I've given a lot of thought to this. He suggested that he understood other district judges had come to different determinations. It's fairly clear what he was referring to are the cases that deny defendants bail under these types of conditions. So fairly read, it appears that Judge Broderick absolutely had this in mind, but there's no magic words requirement here. The question is not what he said. The question is what he did. And what he did was a case-specific determination that a foreign national worth more than $2 billion associated with a foreign government with which we do not have an extradition treaty cannot overcome the presumption of detention at sentencing. That determination was not clearly erroneous, and it alone defeats the defendant's motion. Now if Your Honors were to disagree, we're assuming arguendo you disagree, you then have to face the three questions that the defense proffers in its paper. So I want to take them in order. Section 666, we deal with this in our brief. The defense position is literally inconsistent with the statute. It requires Your Honors to rewrite the statute even if behel had never come down, and it's also utterly unnecessary. The parade of horribles that they surmise is going to occur is dealt with with a series of conventions and treaties and statutes, all of which were cited in behel. That's how Congress and this country deals with concerns about diplomacy and comedy. Even if we were to be inclined, I'll put it, toward your argument, that doesn't mean it's not a substantial question. That alone doesn't mean it's a substantial question. My point is that the statutory language is clear. It doesn't say private organization. It says organization. The parade of horribles the defendant surmises is going to occur, which is sort of a canon of construction, sort of a canon of avoidance here, isn't going to occur, does not occur. The U.N. in fact cooperated with this investigation and has cooperated in other cases. So where the statutory language is clear, and essentially the only argument to the contrary is bad things would happen, and the bad things would happen is not a valid argument, the job of the court is to enforce the statute as written. But even if we're wrong, and organization does not include the United Nations, that only applies to a single count out of six, just one. It doesn't even apply to the conspiracy count, because in this case, the jury was to count four objects, and to be unanimous as to which objects it's found. That's count one. It found all three objects. Only one is section 666. So even if the defense were correct, and it's not, it still doesn't entitle him to bail pending appeal, because he got concurrent sentences on all counts, identical and concurrent sentences. So the point is it wouldn't change the result even if he got a new trial on that issue? It would be meaningless. And the evidence as to all counts was identical. The defense does not contend to the contrary. The second argument is McDonnell. Your Honor should read what Judge Broderick actually said. It starts on page 4243 of the transcript, which is also Exhibit B, to the government's opposition. It absolutely mirrors McDonnell. It is not verbatim to what the defense sought, but that's because what the defense sought didn't make sense. It wanted language having to do with a government, but the U.N. isn't a government. It wanted language having to do with the recipient of a bribe, but the defense, Judge Broderick, didn't use the defense language, no question. But he used language that is lifted directly from McDonnell and from other cases. It talked about specific action. It talked about a meeting isn't enough. It had all of the language it needs to have. Assuming Section 666 even falls under McDonnell, which this Court held in Boyland, it did not. In that situation, what this claim really is, is a sufficiency claim. It is not enough for the defense to say, well, this particular action may not have been official. This particular action may not have been official. The claim has to be no rational jury could have found the defendant guilty, period. They don't even attempt to take on that burden, and they can't meet it, because as the government litigated this case from the beginning and talked repeatedly in summation, the ultimate action the defense wanted, defendant wanted, excuse me, was to move a conference center permanently to a new home to be built by the defendant's for-profit company in Macomb. He wanted it so badly that even when he got a contract, that's the pro bono agreement in December 2014, which is unquestionably an official act. This is a contract between the head of a U.N. component and the defendant. But even when he got that, he kept paying Ambassador Lorenzo. And we know why, because in June 2015, this has all come in at trial, they wanted more. They wanted a General Assembly resolution to ensure that the conference center really would be the permanent home. If an Assembly resolution of the United Nations is not an official act, nothing is. Of course a jury could have concluded this. What is the defendant's report date as of now? July 10th. Well, okay. We're going to reserve decision and try to issue an order as early as this afternoon. I'm out of time, unless the Court has further questions. We rest in our seats. Thank you. Thank you both. We will turn to the regular calendar now. I'll give everyone a moment to ...